UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


SCHOOLCRAFT MEMORIAL HOSPITAL,

       Plaintiff,

                                      CASE NO. 1:07-CV-1278

v.

                                        HON. ROBERT J. JONKER

MICHIGAN DEPARTMENT OF
COMMUNITY HEALTH, et al.,

       Defendants.
_____/

## OPINION

## INTRODUCTION

    Schoolcraft Memorial Hospital (SMH) sues the Michigan Department of Community Health (DCH), Janet Olszewski, Director of DCH, and Michael Dankert, Director of the Bureau of Health Systems, DCH, seeking (1) a judgment declaring a Michigan statute preempted by a federal regulation, and (2) an injunction prohibiting DCH from enforcing both the allegedly preempted Michigan law and a DCH enforcement order.  (docket # 20.)  DCH has agreed to refrain from enforcing the law and order pending resolution of this lawsuit.  (docket # 2.)

    SMH and DCH each move for summary judgment.  (docket ## 30, 32.)  The question presented by the parties' cross motions is a federal question of preemption under the Supremacy Clause of the U.S. Constitution.  The allegedly preempted Michigan law requires swing-bed hospitals to transfer a patient within five days of receiving notice that a bed is available in a nursing home located within a fifty-mile radius of the swing-bed hospital.  The allegedly preempting federal regulation requires swing-bed hospitals to substantially comply with federal regulations precluding

a nursing home from involuntarily transferring a patient unless the transfer is necessary for the patient's welfare, the patient no longer needs the services provided by the nursing home, the safety of others is endangered, the health of others is endangered, the patient has failed to pay for the stay at the nursing home, or the nursing home ceases to operate. The Court heard oral argument on the parties cross motions on June 18, 2008.

After oral argument, SMH moved for leave to file a supplemental brief and for leave to conduct additional discovery in response to questions raised by the Court during oral argument. (docket ## 52–53.) SMH has also moved for leave to file a supplemental brief in support of its motion for a continuance. (docket # 59.) This is a marked change in direction for SMH. SMH's position from its very first filing has been that the issue in this case is fundamentally one of law, that only limited discovery (if any) is necessary to frame the issue, and that the need for expedited briefing and decision should drive trial and pretrial procedures. The parties and the Court crafted a schedule to accommodate SMH's position insofar as practicable. SMH is now suggesting a somewhat different approach.

## BACKGROUND AND PROCEDURE

### A.    *The Swing-Bed Program*

In the 1980s Congress and the Michigan Legislature responded to a growing problem in rural communities: rural hospitals often had an excess supply of acute-care hospital beds while their communities had a scarcity of long-term, nursing-home-type beds. New Payment Methodology for Routine Extended Care Services Provided in a Swing-Bed Hospital, 61 Fed. Reg. 17,677, 17,677 (Apr. 22, 1996). Both Michigan and the United States developed programs to allow rural hospitals to provide nursing-home care to patients who were ready for discharge from the hospital but were not ready to be sent home. *Id.* Those programs, known as the "swing bed provision" under federal

2

law and the "short-term-nursing-care program" under Michigan law,[1] gave rural hospitals the option of providing nursing-home care and receiving Medicare reimbursement in certain circumstances rather than continuing their increasingly common practice of either discharging patients in need of such care or providing the care at no charge. *Id.* The programs did this by allowing hospitals to "swing" the type of care provided in a given hospital bed, and the reimbursement status of that care, from acute care—care normally provided by hospitals—to nursing-home care. *Id.* The purpose behind the programs was to provide a cost-efficient means of providing nursing-home care in rural communities. Id.

B.    *The SMH Setting*

SMH is a twenty-five-bed-critical-access hospital in rural, Manistique, Michigan. On November 25, 1998, SMH applied to the DCH for a certificate of need (CON) to operate a short-term-nursing-care program. A CON is "a certificate issued [by DCH] authorizing a new health facility, a change in bed capacity, the initiation, replacement, or expansion of a covered clinical service, or a covered capital expenditure." MICH. COMP. LAWS ANN. § 333.22203(3) (West 2001 & Supp. 2008). Under Michigan law a short-term-nursing-care program is a program that provides nursing care "in a hospital to a patient who has been discharged or is ready for transfer from a licensed hospital bed other than a hospital long-term care unit bed and cannot be placed in a nursing home bed, county medical care facility bed, or hospital long-term care unit bed located within a 50-mile radius of the patient's residence." MICH. COMP. LAWS ANN. § 333.22208 (West 2001). DCH granted the CON on January 1, 2000.

_____

[1] The parties use the terms interchangeably, and, although the terms are technically different, this Opinion will refer to both the state and federal programs as the "swing-bed program," unless greater precision is warranted in a given instance.

SMH is physically connected to the nearest provider of nursing-home care, the Schoolcraft County Medical Care Facility (SCMCF). (MacAlpine's Aff. ¶ 4.) When a patient is transferred from SMH to SCMCF, the patient simply takes a ride down a hallway and into another room. (*Id.*) In 2007, SCMCF had an occupancy rate of approximately ninety percent and continuously had beds available to accommodate patient transfers from SMH. (*Id.* ¶ 10.) In fact, SCMCF has had beds available since November, 2005. (*Id.* ¶ 39.) SMH was aware that SCMCF had available beds. (*Id.*; SMH Telephone Log for Jan. 2004 to Jan. 2008 (docket # 38-7).)

Both facilities operate under the auspices of the County of Schoolcraft, and both are certified by Medicare. (MacAlpine's Aff. ¶ 6; Am. Compl. ¶¶ 6, 13.). Both can provide essentially the same nursing home care, but they do so at a significant cost differential. In particular, the daily Medicare reimbursement amount that applied to an SMH-swing-bed patient on November 30, 2007, was $2,181.55. (Pl.'s Resp. to Def.'s Interrog. # 6.) The rate that applied to a patient receiving substantially similar care at SCMCF was $336.93. (MacAlpine's Aff. ¶ 20.) SMH received over $1.3 million in 2007 in Medicare reimbursement for care provided to swing-bed patients after the fifth day. (Makowski's Aff. ¶ 15.) And SCMCF saw a corresponding decrease in Medicare dollars of approximately $260,000. (MacAlpine's Aff. ¶ 17.)

### C.    *Notice of Violation*

On May 17, 2007, DCH advised SMH that SMH was not in compliance with one of the state-law requirements applicable to short-term-nursing-care programs. (Letter from Richard J. Benson, Section Chief, DCH, to Frederick Makowski, Administrator, SMH (May 17, 2007) (docket # 1-3).) In particular, DCH advised SMH that it was not in compliance with section 333.22210(3)(f) of the Michigan Compiled Laws, which provides that a hospital with a short-term-nursing-care program shall "[t]ransfer a patient in the short-term nursing care program to an appropriately certified nursing

4

home bed, county medical care facility bed, or hospital long-term care unit bed located within a 50-mile radius of the patient's residence within 5 business days after the hospital has been notified, either orally or in writing, that a bed has become available."  *Id.*; MICH. COMP. LAWS ANN. § 333.22210(3)(f) (West 2001 & Supp. 2008).  This requirement is known as the **five-day rule**.

In response to the May 17 noncompliance letter from DCH, SMH submitted a plan of correction.  (SMH, PLAN OF CORRECTION (docket # 1-5).)  The Plan was designed around SMH's argument that there is an irreconcilable conflict between the five-day rule and a federal Medicare requirement, and that it is impossible for SMH to comply with both rules.  More specifically, SMH contends that the five-day rule is mutually exclusive of a federal regulation that requires a Skilled Nursing Facility (SNF) or a Nursing Facility (NF) to "permit each resident to remain in the facility, and not transfer or discharge the resident from the facility unless" one of six exceptions is satisfied.[2] 42 C.F.R. § 483.12(a)(2) (2007).  This Opinion refers to section 483.12(a)(2) as the SNF "transfer-restriction regulation," or **TRR**.

A short-term-nursing-care program is neither an SNF nor an NF.  SNFs and NFs are, essentially, nursing homes, and the TRR applies only to them.  The TRR does not, by its express

---

[2] 42 C.F.R. § 483.12(a)(2) (2007).  In relevant part, the regulation provides as follows:

(2) Transfer and discharge requirements.  The facility must permit each resident to remain in the facility, and not transfer or discharge the resident from the facility unless—
(i) The transfer or discharge is necessary for the resident's welfare and the resident's needs cannot be met in the facility;
(ii) The transfer or discharge is appropriate because the resident's health has improved sufficiently so the resident no longer needs the services provided by the facility;
(iii) The safety of individuals in the facility is endangered;
(iv) The health of individuals in the facility would otherwise be endangered;
(v) The resident has failed, after reasonable and appropriate notice, to pay for (or to have paid under Medicare or Medicaid) a stay at the facility.  For a resident who becomes eligible for Medicaid after admission to a facility, the facility may charge a resident only allowable charges under Medicaid; or
(vi) The facility ceases to operate.

*Id.*

terms, apply to swing-bed programs.[3]  The only way the TRR is applicable to swing-bed programs is through a different provision of federal law that requires hospitals with swing beds to be "substantially in compliance with," among other things, the TRR.  42 C.F.R. § 482.66(b)(2).  Specifically, a swing-bed hospital must be "substantially in compliance with the following skilled nursing facility requirements . . . . (2) Admission, transfer, and discharge rights (§ 483.12 (a)(1), (a)(2), (a)(3), (a)(4), (a)(5), (a)(6), and (a)(7)). . . ." *Id.*

After receiving the May 17 noncompliance letter and submitting its plan of correction asserting an irreconcilable conflict between the TRR and the five-day rule, SMH continued to flout the five-day rule.  To justify its noncompliance, SMH continued to rely on its argument that it is impossible to comply with both the TRR and the five-day rule.  Other hospitals in the state, however, represent that they are able to comply with both the TRR and the five-day rule.  (Jahn's Dep. 19–20.)  On December 20, 2007, DCH issued an enforcement order that imposed a fine of approximately $500,000 and suspended SMH's short-term-nursing-care program until it demonstrated compliance with the five-day rule.  The order gave SMH an opportunity for administrative appeal.

Instead of invoking available administrative remedies, SMH brought this lawsuit.  It seeks relief from the five-day rule and the enforcement order by arguing that the TRR preempts the five-day rule.  SMH and DCH agree that judicial review of this issue is necessary.  (Stipulation ¶ 4 (docket # 2).)  SMH and DCH also agree that if SMH does not prevail in this federal action then the matter will return to DCH's administrative process for resolution.  (*Id.* ¶ 7.)  The Michigan County Medical Care Facilities Council and the Michigan Health and Hospital Association have filed

---

[3] The TRR applies to "facilit[ies]."  42 C.F.R. § 483.12.  A facility is an SNF or NF.  42 C.F.R. § 483.5.

amicus briefs.  (docket ## 43, 36.)  Neither patients nor patient-rights groups have joined this action as parties or amici curiae.  Nor has the federal agency that promulgated the allegedly preempted regulation appeared as a party or amicus.

## ANALYSIS

SMH argues that the question in this case is whether the federal TRR preempts the state five-day rule.  That, however, misstates the controlling question.  The TRR does not by its terms apply directly to swing-bed hospitals and so there can be no conflict between the TRR and the five-day rule.  The real question in this case is whether the TRR, *as applied by federal swing-bed regulations mandating substantial compliance by swing-bed hospitals*, preempts the five-day rule.  Before the Court addresses that question on the merits, it must address DCH's argument that the Court should either abstain from hearing this case or hold that SMH is estopped from bringing its claim.

### A.    *Abstention*

DCH argues that the Court should apply the doctrine first explicated in *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), and abstain from hearing this case.  It contends that this case turns on the resolution of a state-law issue and that federal review at this stage would not only disrupt state policy regarding swing beds but also interfere with DCH's administrative review process.  SMH counters that abstention is inappropriate because this case is fundamentally one of federal law and the only state-law issues are simple and easy to resolve.  The issue is whether *Burford* abstention is appropriate in this case.

Abstention is "an extraordinary and narrow exception."  *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976).  *Burford* abstention is only appropriate if (1) a case presents "difficult questions of state law bearing on policy problems of substantial import whose importance transcends the result in the case then at bar," or (2) the "exercise of federal review of the

7

question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 361 (1989). In general, federal adjudication of a preemption claim does not disrupt state interests or administrative processes. *See Caudill v. Eubanks Farms, Inc.*, 301 F.3d 658, 661 (6th Cir. 2002) (observing that if the "only issue presented" in a case is "one of federal preemption, which overrides any state interest," then there is "no fear of federal disruption of state administrative processes," and the principles underlying *Burford* are "'not implicated' because the central issue 'does not demand significant familiarity with, and will not disrupt state resolution of, distinctly local regulatory facts or policies.'" (quoting *New Orleans Pub. Serv., Inc.*, 491 U.S. at 364)). Indeed, "*Burford absention is particularly inappropriate when preemption issues are present.*" *Neufeld v. Baltimore*, 964 F.2d 347, 350 (4th Cir. 1992) (emphasis added); *see United States v. Kentucky*, 252 F.3d 816, 827–28 (6th Cir. 2001) (holding that neither of the two *Burford* circumstances was presented because the case "involve[d] a question of preemption under federal law, not a question of state law"); *Time Warner Cable v. Doyle*, 66 F.3d 867, 874 n.6 (7th Cir. 1994) (noting authority from the Supreme Court and the Fourth and Third Circuits holding that *Burford* absention is inappropriate when preemption issues are present in a case); *Neufeld*, 964 F.2d at 350 (collecting cases from the Eighth, Eleventh, and Ninth Circuits holding that *Burford* abstention is inappropriate when preemption issues are present in a case). After all, there is no need to protect state law and an associated state regulatory scheme if the law and scheme are preempted and therefore beyond the state's authority in the first place. *Baggett v. Dep't of Professional Regulation, Bd. of Pilot Comm'rs*, 717 F.2d 521, 524 (11th Cir. 1983).

This is not the extraordinary case in which *Burford* abstention is appropriate. Neither of the *Burford* circumstances is present. First, this case does not involve a difficult question of state law.

8

Instead, it involves a question of preemption under federal law.  Second, adjudication of the preemption question will not disrupt state efforts to establish a coherent policy with respect to public health.  There is no need to abstain merely because deciding the federal question "may result in overturning" state law.  *New Orleans Pub. Serv., Inc.*, 491 U.S. at 363.  To the contrary, if the TRR really does preempt the five-day rule, it would be the Court's obligation to enforce the Supremacy Clause and strike down the state regulation.  The Court is unaware of any case involving federal preemption in which the appellate courts have sustained *Burford* abstention, and DCH has not cited such a case.[4]  Accordingly, the Court will not abstain and will instead exercise its jurisdiction to hear SMH's claim.

    **B.**    ***Estoppel***

       DCH argues that SMH should be estopped from bringing its preemption claim.  It contends that allowing SMH to bring this action would be inequitable.  The question is whether equitable estoppel should be invoked to prevent SMH from advancing its claim.

       Equitable estoppel may be invoked to prevent a party from advancing a claim if allowing the party to advance the claim would be an injustice.  *Thomas v. Miller*, 489 F.3d 293, 299 (6th Cir. 2007).  "Like discovery sanctions, the doctrine often operates to prevent a party who engaged in bad faith conduct from making certain arguments or claims in court."  *Id.*  A party wishing to employ equitable estoppel against another party must establish five elements: (1) "the party to be estopped must have used 'conduct or language amounting to a representation of material fact,'" (2) "that party must have been aware of the true facts," (3) that party must have intended the other party to act on the representation, or that party must have conducted himself in such a way that the other party had

---

    [4] The stipulation of the parties further suggests that even DCH agrees that the federal preemption issue is ripe for decision.

a right to believe that the party intended the other party to act on the representation, (4) "the party asserting estoppel must have been unaware of the true facts," and (5) "the party asserting estoppel must have detrimentally and justifiably relied on the representation." *Id.* at 302.

Equitable estoppel is not appropriate in this case. Allowing SMH to advance its federal preemption claim would not be an injustice. There is no evidence that SMH engaged in bad-faith conduct before bringing this action or in applying for and receiving its swing-bed CON. DCH argues that SMH applied for a CON knowing full well that it had to comply with the five-day rule, that it represented to DCH that it would comply with the five-day rule, that it knew of the alleged conflict with federal law, and that it never intended to comply with the five-day rule. Even if DCH's characterization of SMH's conduct is correct,[5] DCH has not presented sufficient evidence to establish the first or fifth elements of the five-element estoppel test set forth by the Sixth Circuit in *Thomas*. First, there is no evidence that SMH ever made a representation of material fact to DCH regarding its compliance with the five-day rule. There is no evidence, for example, that SMH ever told DCH something to the effect of "yes, we have always transferred our swing-bed patients within five days of receipt of notice of an empty bed." At most there is evidence of a general promise to comply with state law. A general promise to abide by the law is not a representation of material fact. Second, there is no evidence of justifiable and detrimental reliance. DCH would not be justified in expecting SMH to comply with invalid (i.e., preempted) state law, and it presents no evidence that it was harmed in any way by relying on SMH's alleged promise to comply with (potentially invalid) state law. All SMH is asking this Court to determine is whether federal law

---

[5] The Court does not see any direct evidence in this record of knowing misrepresentations by SMH in the CON process.

preempts the five-day rule.  In these circumstances, estoppel is inappropriate and the Court will consider the merits of SMH's claim.

### C.      Preemption

Having decided that neither abstention nor equitable estoppel is appropriate in this case, the Court now turns to the question on the merits: does the TRR, as applied by federal swing-bed regulations mandating substantial compliance by state swing-bed hospitals, preempt the five-day rule?  The Court holds that the TRR, 42 C.F.R. § 483.12(a)(2), as applied to swing-bed hospitals through 42 C.F.R. § 482.66(b)(2), does not preempt the five-day rule, MICH. COMP. LAWS ANN. §333.22210(3)(f).  There is no direct conflict between the laws.  In fact, hospitals other than SMH represent that they are able to comply with both.  The record in this action suggests that SMH is endeavoring to contrive an irreconcilable conflict so that it can (1) continue to enjoy the considerable revenue stream that it has received from using swing-beds in violation of the five-day rule and (2) then use that revenue stream to finance a new hospital-construction project even though there are long-term beds available at much lower average cost to the taxpayer in the immediately adjacent and physically connected SCMCF.  Indeed, the SCMCF, which is controlled by the same county that controls SMH, has had available beds since November, 2005.  Under these circumstances, federal preemption does not apply.  To the contrary, preempting the state regulation on these facts would have the perverse effect of preventing use in a rural county of available, convenient, and low-cost-nursing-home beds in favor of higher-cost swing beds.  Such a result would turn the purpose of the swing-bed program on its head.

### 1.      General Preemption Principles

The Supremacy Clause of the Constitution provides that the Constitution, and the laws and treaties made under it, are the supreme law of the land.  *Gade v. Nat'l Solid Waste Mgmt. Ass'n*, 505

11

U.S. 88, 108 (1992).  Federal law is supreme and state law is invalid when federal law preempts it. *Id.*; *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211 (1824).  There are two broad categories of preemption: express and implied.  *Gade*, 505 U.S. at 98.  SMH does not argue express preemption; the only issue is whether preemption is implied by a clear congressional intent to preempt state law.  There are at least two types of implied preemption: field and conflict.  Field preemption exists if Congress creates a "scheme of regulation so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it."  *Id.*  SMH does not argue field preemption.  Conflict preemption exists if compliance with both federal and state regulations is a "physical impossibility," or if the state law is an obstacle to the accomplishment and execution of the purposes and objectives of Congress in enacting the federal law.  *Id.*  SMH argues only conflict preemption.

The Supremacy Clause applies to federal agency regulations, like the TRR.  Preemption is not limited to acts of Congress.  Federal regulation may also preempt state law.  *Fidelity Fed. Sav. & Loan Ass'n v. De La Cuesta*, 458 U.S. 141, 153–54 (1982)  But unless the underlying statute expressly preempts state law, there is, as a practical matter, a strong presumption against preemption by regulation.[6]  Exec. Order No. 13,132, 64 Fed. Reg. 43,255 (Aug. 4, 1999).  And as a general rule

---

[6] There is some guidance with respect to the preemptive effect of regulations:

Sec. 4. Special Requirements for Preemption.  Agencies, in taking action that preempts State law, shall act in strict accordance with governing law.  (a) Agencies shall construe, in regulations and otherwise, a Federal statute to preempt State law only where the statute contains an express preemption provision or there is some other clear evidence that the Congress intended preemption of State law, or where the exercise of State authority conflicts with the exercise of Federal authority under the Federal statute. (b) Where a Federal statute does not preempt State law (as addressed in subsection (a) of this section), agencies shall construe any authorization in the statute for the issuance of regulations as authorizing preemption of State law by rulemaking only when the exercise of State authority directly conflicts with the exercise of Federal authority under the Federal statute or there is clear evidence to conclude that the Congress intended the agency to have the authority to preempt State law.  (c) Any regulatory preemption of State law shall be restricted to the minimum level necessary to achieve the objectives of the statute pursuant to which the regulations are promulgated.  (d) When an agency foresees the possibility of a conflict between State law and Federally protected interests within its area of regulatory responsibility, the agency shall consult, to the extent practicable, with appropriate State and local officials in an effort to avoid such a conflict.  (e) When an agency proposes to act through adjudication or rulemaking to preempt State law, the agency shall provide all affected State and local officials notice and an opportunity for appropriate participation in the proceedings.

Exec. Order No. 13,132, 64 Fed. Reg. 43,255 (Aug. 4, 1999).

there is also a presumption against preemption by statute. *Downhour v. Somani*, 85 F.3d 261, 265 (6th Cir. 1996) (citing *Broyde v. Gotham Tower, Inc.*, 13 F.3d 994, 997 (6th Cir.); *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 115 S. Ct. 1671, 1676 (1995)). These presumptions are entirely fitting because of the delicate nature of our federalist structure of government.

The presumption against preemption is so strong that even in the face of an apparently clear conflict between federal and state law the Supreme Court has not found preemption absent clear congressional intent to preempt conflicting state law. As an example, the Supreme Court refused to find preemption even in a case where strict compliance with federal law could result in a violation of state law. *Midatlantic Nat'l Bank v. New Jersey Dep't of Envtl. Prot.*, 474 U.S. 494, 497–500, 507 (1986). In *Midatlantic Nat'l Bank*, New Jersey law expressly prohibited the abandonment by a bankruptcy trustee of contaminated property unless the property was first decontaminated. *Id.* Federal bankruptcy law expressly allowed a bankruptcy trustee to abandon any property that was burdensome to the estate or of inconsequential value to the estate. *Id.* The conflict is readily apparent: a strict enforcement of state law prohibiting abandonment of contaminated property conflicted with federal law permitting such an abandonment. Yet the Court held that because there was not sufficient evidence that Congress intended to preempt state laws constraining the exercise of a bankruptcy trustee's power, there was no preemption. *Id.*

**2.    The TRR and the Five-Day Rule are Compatible**

This is an even weaker case for preemption than *Midatlantic Nat'l Bank* because the apparent conflict that SMH frames depends on a misreading of applicable federal law. SMH is not itself an SNF to which the TRR directly applies. Rather, SMH is first and foremost an acute-care hospital with the added privilege under state and federal law of using its excess acute-care capacity to

13

provide temporary swing-bed nursing care when nursing homes are not readily available in the geographic area to provide that service.[7]  To the extent that the TRR applies to the SMH swing beds, it is only through 42 C.F.R. § 482.66(b)(2), which does not require a literal or rigid compliance with the TRR, but rather "substantial compliance."

As in *Midatlantic Nat'l Bank*, there is no indication that Congress intended to preempt state-law standards in this case.  On the contrary, there are at least two reasons why Congress appears to have intended just the opposite.

First, the purpose behind requiring swing-bed hospitals to substantially comply with the TRR is entirely consistent with the purpose behind the five-day rule.  The primary purpose behind requiring swing-bed hospitals to substantially comply with certain SNF regulations, including the TRR, was to ensure that swing-bed patients did not receive substandard care compared to the care received by SNF patients.  Flexibility in Application of Long-Term Care Standards to Swing-Bed Hospitals, 47 Fed. Reg. 31,518, 31,520 (July 20, 1982).  Requiring substantial compliance with the TRR reflects "clear statutory intent" to (1) assure adequate quality of care for swing-bed patients, and (2) utilize excess capacity and increase the supply of long-term beds in rural areas.  *Id.*  Those purposes are entirely consistent with the five-day rule, which was intended to use available long-term-bed capacity and to make sure patients get SNF care when they need it.[8]  Assuming that those purposes are met, the quality of care at SMH is substantially similar to the quality of care at

---

[7] On the current record it is not clear that the SMH swing beds should have been used at all.  Given that beds have been available in SCMCF since November, 2005, the record seems to demonstrate that SMH's beds were not eligible for use as swing beds in the first place. *See* MICH. COMP. LAWS ANN. § 333.22208 (defining a swing-bed hospital under Michigan law to be a hospital that provides long-term care to "a patient who has been discharged or is ready for transfer from a licensed hospital bed other than a hospital long-term care unit bed *and cannot be placed in a nursing home bed, county medical care facility bed, or hospital long-term care unit bed located within a 50-mile radius of the patient's residence*" (emphasis added)).

[8] Indeed, the short-term-nursing-care program is, by definition, designed to provide care to individuals who cannot be placed in an SNF because there is no SNF space available.  MICH. COMP. LAWS ANN. § 333.22208.  Here, the record suggests that there was ample space available in the SCMCF.

SCMCF.  Yet swing-bed care at SMH costs the federal government roughly six times more than the substantially similar level of care provided at SCMCF.  Absent an explicit statement from Congress, the Court is unwilling to hold that Congress intended to preempt a state law that results in patients being provided with essentially the same services at one-sixth the cost.  A federal regulation requiring only "substantial compliance" with the TRR does not express the necessary, unequivocal intent to preempt a state law that effectuates a federal purpose and simultaneously saves millions of federal dollars.

An interesting historical note bolsters the point that the TRR and the five-day rule are not in irreconcilable conflict.  The federal swing-bed program once imposed a similar, but not identical, five-day requirement on certain swing-bed hospitals.  42 C.F.R. § 413.114(d)(2)(i).  The stated purpose of that requirement was "to assure that hospitals [subject to the requirement] would not retain SNF patients for more than 5 days when SNF beds are available in the locality."  Swing-Bed Program Changes, 56 Fed. Reg. 54,539, 54,542 (Oct. 22, 1991).  That requirement has since been repealed, but nothing indicates that the repeal of the federal five-day rule was intended to preempt states from having a similar rule.  Because the federal government itself thought it possible for the TRR to coexist with a rule very similar to the five-day rule, this Court is especially reluctant to wield the federal power of implied preemption.

A second indication that Congress did not intend to preempt the five-day rule is that the plain language of the TRR does not necessarily conflict with the plain language of the five-day rule.  Once again, the federal regulations require only substantial compliance with the TRR.  If the agency intended to preempt the five-day rule, it would have used stronger words than "substantial compliance," or it would have simply directly applied the TRR to swing-bed hospitals.  A reasonable inference is that the agency elected not to do so because the purposes of the TRR as

directly applied to SNFs, which exist to provide nursing-home care, are different from the purposes of the TRR as indirectly applied to swing-bed hospitals, which exist primarily to provide acute care and only secondarily to provide nursing-home care in times of peak demand. A swing-bed hospital substantially complies with the TRR when it abides by the five-day rule.

Furthermore, it is possible for a swing-bed hospital to literally—not just substantially—comply with both the TRR and the five-day rule. One simple example of a way for SMH to comply with both is to secure a potential swing-bed patient's advance consent to transfer upon availability of an SNF bed in the area. This would honor the letter and spirit of both the TRR and five-day rule. Of course, on this record it appears that SMH's swing beds would then get precious little use because beds have been available in SCMCF since November, 2005, at a fraction of the cost to the federal government. The Court can understand why SMH would prefer to preserve its revenue stream, but that interest does not weigh in favor of federal preemption of a state law. In fact, in this case it weighs directly against it.

Moreover, even though SMH insists that it is impossible to comply with both the TRR and the five-day rule, there is no evidence that any other swing-bed hospital in Michigan is impacted by the alleged conflict. In fact, at least one other Michigan swing-bed hospital represents that it is able to comply with both the five-day rule and the TRR as applied to swing-bed hospitals. Compliance with both requirements is not a physical impossibility and the TRR does not preempt the five-day rule.

### 3. SMH's Other Arguments Are Unpersuasive

SMH's arguments to the contrary are misplaced for at least three reasons.

First, all of SMH's arguments ignore the critical fact that the TRR does not directly apply to swing-bed facilities. SMH contrives a conflict by framing its argument on the false foundation

16

that swing-bed hospitals must literally and strictly comply with, rather than substantially comply with, the TRR.  SMH supports its argument by citation to guidance interpreting the application of the TRR to SNFs, not to swing-bed facilities.  Nowhere, however, is there authority containing an explicit statement that "substantial compliance" means "precise, verbatim compliance."  SMH makes that assertion but it is unable, even in its supplemental briefings, to cite any authority that actually and explicitly supports its bald assertion.  The unavoidable and dispositive fact is that swing-bed hospitals are not SNFs and 42 C.F.R. § 482.66(b)(2) provides that swing-bed hospitals, unlike SNFs, need only substantially comply with the TRR.  The reasons for this important regulatory distinction are deeply and rationally rooted in the very genesis of the swing-bed program, and the Court cannot accept SMH's invitation to read the word "substantial" out of the regulation, or to substitute another word, such as "strict" or "literal."

Second, despite SMH's assertion to the contrary, nothing in the five-day rule prevents a careful and individualized consideration of patient welfare.  A case-by-case analysis is still proper before any patient transfer.  It will still be necessary to determine whether transfer is proper at all or whether the resident needs additional acute care—care that cannot be provided at an SNF.  MICH. COMP. LAWS ANN. § 333.22210(c).  More generally, no one is suggesting that the five-day rule is being applied in a way that requires transfers that imperil patients' welfare.  The same considerations that would apply before a transfer from an acute-care setting to an SNF bed at another facility will still apply to a later transfer from a swing bed.  Moreover, on this record SMH's patient welfare-arguments ring hollow.  No patients or patient-rights groups are here to press the point; perhaps that is because "transfer" from SMH to SCMCF amounts to nothing more than a ride down the hall.

17

Finally, and most importantly, even if the TRR and five-day rule were fundamentally in conflict as SMH contends, preemption would still not be appropriate here.  In this case, as in *Midatlantic Nat'l Bank*, the lack of evidence supporting a congressional intent to preempt, combined with the fact that the purposes behind the federal rule do not conflict with the purposes behind the five-day rule, requires holding that there is no preemption.  *Midatlantic Nat'l Bank* is not limited, as SMH contends, to the claim that absent an expressed, contrary intent a federal statute supplements rather than supplants existing common law.  Such a cramped reading reduces the holding of that case to a platitude.  After reviewing the legislative history of the bankruptcy code, the Supreme Court in *Midatlantic Nat'l Bank* held that "Congress did not intend for the Bankruptcy Code to preempt all state laws that otherwise constrain the exercise of a trustee's power."  *Midatlantic Nat'l Bank*, 474 U.S. at 505.  The thrust of *Midatlantic Nat'l Bank* is that, despite the apparent mutual exclusivity of a federal and state law, Congress's overall intent controls the preemption question.  And if Congress does not make its intent to preempt clear, then a court should not find preemption.  In this case, even if there were mutual exclusivity of federal and state law, there is not a clear congressional intent to preempt.  Thus there is no preemption.

### 4.    Agency Letters from Mr. Daly

The interpretive letters that SMH has submitted from Robert Daly, Manager of the Long Term Care Certification and Enforcement Branch of the Department of Health and Human Services' Centers for Medicare and Medicaid Services (CMS),[9] do not change that result.  Those letters reflect, at most, the opinion of one employee of CMS—a nonparty to this action—that the TRR preempts the five-day rule because the two irreconcilably conflict.  The letters do not establish that

---

[9] (docket ## 40-3, 47-2).

Congress intended to preempt the five-day rule.  They do not establish that the Department of Health and Human Services intended to preempt the five-day rule when it promulgated 42 C.F.R. § 482.66(b)(2), the rule requiring swing-bed hospitals to substantially comply with the TRR.  And they do not establish that the purpose behind requiring substantial compliance with the TRR conflicts with the purpose behind the five-day rule.  In short, the letters do not establish preemption or any factor that would militate in favor of finding preemption.

Since the hearing on the parties' cross motions, Mr. Daly's opinions—whatever they may be—have garnered an unnecessarily large share of attention.  There was first the question of whether the letters could be considered at all on the summary judgment motions since they are neither duly promulgated federal law nor admissible evidence on an issue of disputed fact.  As explained at the hearing, the letters are inadmissible hearsay: they are simply the unsworn, out-of-court statement of a nonparty offered to prove the truth of the matter asserted.  No hearsay exception applies.[10] Accordingly, the Court may not consider them on the parties' cross motions for summary judgment. *See North American Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1283 (6th Cir. 1997) (citing cases

---

[10] The best candidate for an exception is the public records exception in Rule 803(8).  That hearsay exception provides that otherwise inadmissible hearsay is sufficiently reliable to be admissible if it appears, in any form, in the "[r]ecords, reports, statements, or data compilations . . . of public offices or agencies," and if it sets forth (1) the agency's activities, (2) matters observed pursuant to a duty provided by law, or (3) factual findings resulting from an investigation made pursuant to authority granted by law.  FED. R. EVID. 803(8).  The letters from Mr. Daly do not set forth CMS's activities, matters that Mr. Daly observed pursuant to a duty provided by law, or factual findings resulting from an investigation made pursuant to authority granted by law.  Accordingly, the public records exception does not apply to the letters, and no other exception is even arguably applicable.  Moreover, the Court does not find the requisite circumstantial guarantees of trustworthiness to admit the letters under the residual hearsay exception in Rule 807.  The letters are the out-of-court statements of a declarant who made the hearsay statements without the solemnity of the oath that would be administered were Mr. Daly to testify in court.  Furthermore, it is clear from the record that Mr. Daly will not be voluntarily made available to testify; there will be no opportunity to observe his demeanor or to cross-examine him.  This alone is sufficient reason to exclude the letters.  *See* WIGMORE, 5 EVIDENCE § 1367, at 2 (Chadbourn rev. 1974) (explaining that cross-examination is "beyond any doubt the greatest legal engine ever invented for the discovery of truth").  Further indicia of the unreliability of the statements of the letters are the facts that the letters were written to one of the parties to this litigation – not to the Court or the parties generally; and they are essentially an adoption of that parties' language – they do not present an independent statement of the declarant and are in that respect elicited by leading questions. No hearsay exception applies.

from the Sixth and Tenth Circuits holding that a court cannot consider hearsay evidence in reviewing a motion for summary judgment).

The Court's explanation at the hearing precipitated an attempt on the part of SMH to put the letters in an admissible form by including a certification that Mr. Daly signed the letters in his official capacity. (Pl.'s Mot. Continuance (docket # 53).) That is beside the point because no one questioned the authenticity of the letters. The challenge was to the substantive admissibility of the letters in the face of the hearsay rule. A certified signature does not convert otherwise inadmissible hearsay into admissible evidence.

The more telling part of SMH's post-hearing motion was its admission that it had tried to have Mr. Daly prepare and sign an affidavit reciting the content of his letter, but that the federal agency he works for prevented him from doing so. (*Id.* ¶ 3.) This may well explain why Mr. Daly submitted a letter and not an affidavit, but a federal agency's policy against providing potentially admissible evidence for one party to a litigated dispute in federal Court—especially when the party adverse to one of the agency employee's putative position is one of the fifty states—does not allow consideration of otherwise inadmissible evidence.

As a last-ditch effort on this point, SMH asks for permission to reopen discovery so that the parties can take the deposition of Mr. Daly and otherwise gather additional evidence of the federal agency's position on the preemption issue. (*Id.* ¶¶ 5–6.) Until filing this motion, SMH had steadfastly asserted that the pivotal issues in this case were susceptible to resolution as a matter of law and that discovery was unnecessary, or at least needed only to a very limited extent. SMH pushed for early and expedited briefing and decision. In addition, SMH resisted repeated suggestions by the Court to consider bringing CMS into this case since CMS's position was a potential source of dispute, and since CMS would not necessarily be bound by the Court's ruling

20

absent its participation as a party in this case.[11]   SMH repeatedly expressed its desire to proceed without CMS as a party.  At this point in the case it is too late for SMH to try to refashion its case. The parties and the Court have framed the issues, expended resources, and taken their best hold on the issues.  There is no warrant for a second bite at the apple

But more fundamentally, additional discovery from Mr. Daly would not and could not change the outcome in this case.  Even assuming that there were a basis to reopen discovery; and even assuming that the parties were able to jump through the regulatory hoops required to take the deposition of a federal officer; and even assuming that Mr. Daly then testified at his deposition to exactly what he put in his letters, there would still be no basis for preemption.  Federal preemption of a state law is ultimately a matter of congressional (or agency, as the case may be) intent, as expressed in the statutory language and duly promulgated regulations that apply the congressional acts.  In both situations preemption is presumptively disfavored.  Exec. Order No. 13,132, 64 Fed. Reg. 43,255 (Aug. 4, 1999); *Downhour v. Somani*, 85 F.3d 261, 265 (6th Cir. 1996).  There is no possible federal preemption based simply on a letter, affidavit, or even deposition of a federal officer.  Imagine the chaos that would ensue as parties jostled to have federal officers declare on behalf of their employer agency the preemptive policy or interpretation of the agency.  Federal preemption of state law is a serious exercise of federal power that is properly limited to situations of clear congressional intent, either in plain statutory language or duly promulgated agency regulations.  Accordingly, there is no reason to reopen discovery in this matter.

---

[11] The Court notes that joining CMS might have cured the hearsay problem SMH has with the Daly letters because statements of a party are generally not hearsay, at least when offered against the party.

### 5.     An Alternative Analysis Yielding the Same Result

Even under a similar but alternative preemption analysis the result is the same.  Absent congressional intent to the contrary, a state is free to promulgate standards that are more stringent than federal standards.  *See Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132 (1963).  Unless Congress makes a contrary intent clear, it is presumed to establish floors, not ceilings, especially in areas like public health where regulation falls within the traditional role of states.  *Id.* at 146.

In this case, it does not appear that Congress was trying to establish an exclusive standard.  Congress intended to ensure that care in swing beds was substantially similar to care in SNF beds.  Flexibility in Application of Long-Term Care Standards to Swing-Bed Hospitals, 47 Fed. Reg. 31,518, 31,520 (July 20, 1982).  This explains why the Department of Health and Human Services provided that swing-bed hospitals need only "substantially comply" with the TRR.  Congress was less concerned with putting firm time limits on patient stays in a state's swing-bed program than it was with ensuring that SNF standards were applied flexibly to swing-bed hospitals to ensure that the care provided in swing-bed programs was on par with the care provided in SNF programs.[12]

Nothing suggests that Congress intended states to *require* swing-bed hospitals to allow swing-bed patients to stay in swing beds indefinitely.  The only authority of which the Court is aware that even arguably touches on the issue is (1) Part A-1500 of Appendix T of the State

---

[12] This is made clear by the fact that the goal was not to set a national bar applicable to everyone, but rather to set a bar that ensured swing-bed patients received the same level of care they would receive in an SNF in the same geographic area.  *See* Flexibility in Application of Long-Term Care Standards to Swing-Bed Hospitals, 47 Fed. Reg. 31,518, 31,520 (July 20, 1982) ("In determining which additional standards to apply, we believe that equity among providers of nursing home care requires as much consistency in treatment as possible.  For example, if certain professional services are not readily available in a particular geographic area, it seems inequitable to require that these services be provided in local free-standing and distinct part nursing homes, but not in a nearby swing-bed hospital.  We have, however, kept the swing-bed requirements to a minimum, and ***the standards which we are including will be applied as flexibly as possible***." (emphasis added)).

Operations Manual, which provides that "[t]here is no length of stay restriction for any hospital swing-bed patient" and that "[t]here is no Medicare requirement to place a swing-bed patient in a nursing home and there are no requirements for transfer agreements between hospitals and nursing homes"; and (2) a Federal Register preamble in which the Department of Health and Human Services responded to a comment as follows:

> Comment: One commenter suggested that Federal regulations should supersede State laws and regulations. The interim final regulations provide that hospitals with fewer than 50 beds are not subject to the 5-day transfer requirement. This commenter further pointed out that some State laws may have swing-bed regulations that subject such hospitals to the 5-day transfer requirement. For this and other conflicting requirements that may be in State laws, the commenter suggested the Federal regulations should explicitly take precedence. The commenter was concerned that litigation may occur over conflicting requirements.

> Response: Federal requirements are binding with respect to the issues to which they apply but do not restrict State options to impose higher or more restrictive standards in the absence of a specific statutory prohibition. The commenter's suggestion goes beyond our authority to implement this provision.

State Operations Manual, Appx. T, A-1500 (May 21, 2004); Swing-Bed Program Changes, 56 Fed. Reg. 54,539, 54,542–43 (Oct. 22, 1991). Those two authorities, when taken together, merely indicate that Congress did not set a standard and left open the possibility that a state could set a more restrictive standard. That is not preemption. More is needed to find that Congress intended to set the one-and-only time limit (or lack thereof) applicable to patient stays in Michigan swing-beds. There is no indication that Congress intended to take away a state's power to establish its own standards on this issue. Accordingly, the TRR does not preempt the five-day rule.

## CONCLUSION

The TRR, 42 C.F.R. § 483.12(a)(2), as applied to swing-bed hospitals through 42 C.F.R. § 482.66(b)(2), does not preempt the five-day rule, MICH. COMP. LAWS ANN. § 333.22210(3)(f). The two provisions are compatible, and there is no indication that Congress intended the federal swing-

23

bed-transfer regulations to preempt state regulations. Plaintiff's supplemental brief and Mr. Daly's letters do not change that result; nor would an affidavit or deposition of Mr. Daly. Accordingly, Defendants' motion to strike the letters from Robert Daly (docket # 48) is GRANTED. Plaintiff's motion for leave to file a supplemental brief (docket # 52) is GRANTED. Plaintiff's motion to continue (docket # 53) is DENIED. Plaintiff's motion for leave to file a supplemental brief (docket # 59) is GRANTED. Defendant's motion for summary judgment (docket # 30) is GRANTED, and Plaintiff's motion for summary judgment (docket # 32) is DENIED.

Dated:   August 12, 2008          /s/ Robert J. Jonker
                                   ROBERT J. JONKER
                                   UNITED STATES DISTRICT JUDGE

24